LEE M. FRIEDMAN, receiver, *vs.* COUNTY OF HAMPDEN & others.

Hampden.    September 28, 1909. — January 27, 1910.

Present: MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Lien*, Claims arising from construction of public works.    *Contract*, Construction.    *Evidence*, Presumptions and burden of proof.    *Mechanic's Lien*.    *Assignment*.    *Interest*.

The legal meaning of a contract in writing between a county and a contractor relating to the construction of a public work, so far at least as it respects the rights of third parties, is to be determined by its phraseology read in the light of the then existing statutes; and if the contract contains a provision that, " if at any time there shall be evidence of any lien or claim for which, if established, the owner or said premises might become liable, and which is chargeable to the contractor, the owner shall have the right to retain out of any payment then due or thereafter to become due an amount sufficient to completely indemnify him against such lien or claim," such provision as matter of law is to be regarded as the security which St. 1904, c. 349, requires, namely, security, which it is the duty of the contractor to furnish and of the officers of the county to see furnished, for payment by the contractor and subcontractors for labor performed or furnished and for materials used in the construction of such public work.

The presumption, that officers of a county, in making in 1905 a contract in writing with a contractor for the construction of a public work, knew of St. 1904, c. 349, providing that under such circumstances such officers " shall obtain sufficient security . . . for payment by the contractor and subcontractors for labor performed or furnished and for materials used in such construction," is a presumption of law, and not a presumption of fact, and therefore evidence is not admissible to prove that in making such contract the officers did not know of the statute.

Any one who is a creditor of either the original contractor or of a subcontractor of

any degree for labor performed or furnished, or for materials furnished and actually used in the construction of a public work, is within the protection of St. 1904, c. 349, providing that officers contracting for the construction of such public work " shall obtain sufficient security . . . for payment by the contractor and subcontractors " for such labor and materials, and such creditor by complying with the requirements of the statute may have the benefit of the security thus obtained.

If a subcontractor agrees with one, who has contracted with a county to construct a public building, to perform the excavation and masonry work called for by the main contract, and also in his contract agrees " to provide all necessary fences, . . . etc., for the protection of the public, watchman . . . and leave the lot around the building clean and properly graded for relaying the finish soil upon the same," and in the performance of his contract erects a very light board temporary cheap fence, employs a night watchman while the building is being constructed, and excavates and removes earth and does grading with loam carted for the purpose, and it appears that the fence is necessary to keep people away from the building while it is in process of construction and the watchman is necessary to protect the property and materials, and that the changing of the loam and the carting of it may fairly be regarded as merely incidental to the grading, the expenses to the subcontractor of erecting and using the fence and of the employment of the night watchman and of the changing and carting of the loam constitute items of the cost of the material and labor which finally go into the building, for which he could have had a lien under R. L. c. 197, if the building were owned by a private person, and for which therefor he has a right to make a claim upon the security furnished under St. 1904, c. 349. But a subcontractor who performs the work of furnishing, putting up and removing radiators for the drying of plastering put in by another subcontractor has no such lien and no such right.

A subcontractor made with one, who had contracted with a county to erect for it a public building, a contract to perform for the contractor the specifications thereof as to roofing, and later made with the contractor by letters an agreement to perform similar specifications as to a boiler house which the contractor also was to construct for the public building, the subcontractor to do the work as " an addition to " his " contract for work" on the public building, " it being understood that the terms of payment and general conditions of the above contract shall apply to the Boiler House, and are made a part of this order, the same as if written in full herein." The contractor, while not in default for payments under the first contract with the subcontractor, became in default under the second contract and the subcontractor, after having completed the work under the second contract, ceased work under the first contract. *Held,* that the parties regarded the two contracts as connected with each other so that a breach of the second contract warranted the subcontractor in refusing further performance of the first, and that he might establish a lien under St. 1904, c. 349, upon security held by the county commissioners for the labor performed and furnished and for materials used in such construction.

Where, by the provisions of a contract between the officers of a county and a contractor relating to the construction of a public work, fifteen per cent of the contract price is reserved for security for lienors under St. 1904, c. 349, and thereafter the contractor assigns his interest in such fund, the assignee's rights to the fund are subject to the rights of persons who are entitled to liens thereon, and if the valid claims of such lienors exceed the amount so reserved, such assignee can receive nothing.

Where, in a suit in equity, claims of creditors having liens upon a fund held as security for such claims by county commissioners under the provisions of a contract with a contractor for the construction of a public building and the provisions of St. 1904, c. 349, have been established and the fund so held is inadequate to satisfy all of them in full, interest should be reckoned and allowed upon each claim from the time when such claim became due up to the date of the filing of the bill in equity, and then the reserved fund should be divided *pro rata* among such creditors in accordance with the amounts of the claims including interest so reckoned.

BILL IN EQUITY, filed in the Superior Court on January 25, 1908, and afterward amended, by the receiver of the Fosburgh Company against the county of Hampden, with which the Fosburgh Company had made contracts in writing for the construction of the Hall of Records and heating plant as stated in the opinion; the Chapin National Bank, to whom the Fosburgh Company had executed as security for loans of $15,000 an assignment of its right to fifteen per cent of the contract price to be paid by the county of Hampden under the contracts, which amounts, $19,022.70 and $4,581.85, were held by the county under the provisions of the contract stated in the opinion; and various persons and corporations who had filed with the county in accordance with St. 1904, c. 349, statements of claims for materials furnished and labor performed in connection with the Hall of Records and heating plant. The bill alleged that the assignment to the bank was null and void because it purported to operate only on a part of the funds to become due from the county to the Fosburgh Company, and because the formal requirements of the statutes as to assignments and the recording of them had not been complied with. The prayers of the bill were that the defendants other than the county should be enjoined from interfering with the payment by the county to the plaintiff of the $19,022.70 and $4,581.85 still due under the contracts, and that the county should be ordered to pay those sums to the plaintiff; also

CROSS BILLS IN EQUITY by the bank and by the various claimants for labor and materials above described, seeking to establish their respective claims to the funds in the hands of the county.

The case was referred to Nathan P. Avery, Esquire, as master, to " hear the parties, to examine their vouchers and evidence, and make report of the facts thereof and such parts of the evi-

dence as may be necessary to present any questions of law which may arise at the hearing."

Those of the findings of the master which relate to claims of Henry J. Pratt and Company, mentioned in the paragraph of the opinion numbered 4, were in substance as follows :

Henry J.Pratt and Company made a contract in writing with the Fosburgh Company on December 14, 1905, to do the roofing and metal work on the Hall of Records called for by that company's contract with the county of Hampden.   On July 24, 1906, they agreed to do a similar work on the boiler house in letters between themselves and the Fosburgh Company which referred to the work agreed to be done as " an addition to your [Pratt and Company's] contract for work on the Hall of Records dated December 14, 1905, it being understood that the terms of payment and general conditions of the above contract shall apply to the boiler house, and are made a part of this order, the same as if written in full herein."   The work of Henry J. Pratt and Company on the boiler house contract was completed on March 6, 1907, no payments were made to them, and they duly filed their claim with the county commissioners under St. 1904, c. 349.   Because of the failure of the Fosburgh Company to make payments on the boiler house contract with them, Henry J. Pratt and Company ceased work under the contract of December 14, 1905, on November 15, 1907.   The master found as follows: " Shortly after respondents completed their work on the boiler room which was March 6, 1907, they notified the Fosburgh Company that they refused to continue work on the Hall of Records contract unless the payments due on the boiler room should be paid.   If the agreement made on the twenty-fourth day of July, 1906, for work on the boiler room should be construed as an extra to and part of the original contract with the Fosburgh Company then at the time the respondents so notified the Fosburgh Company there had been a default on the part of the Fosburgh Company in the payments for work done under said original contract.   If, however, the agreement of July 24, 1906, is a separate contract, then at the time they so notified the Fosburgh Company, there had been no default on the part of the Fosburgh Company on the payments on the hall of records contract."

Under an agreement with the county commissioners, Henry J. Pratt and Company afterwards completed for a stipulated price the work on the roofing of the Hall of Records. The county commissioners having called their attention to some needed repairs in the work which they previously had done under their contract with the Fosburgh Company, they made such repairs on November 16, 1907, which the master said were worth $2.90. They filed their claim under St. 1904, c. 349, with the county commissioners on January 11, 1908.

The McClean referred to in the paragraph of the opinion numbered 4, was under contract with the Fosburgh Company to set up some radiators in the Hall of Records building, placing them out from the wall, so that the walls might be plastered and dried, and to disconnect them later after the Fosburgh Company was through using them. The master found " that it was necessary in constructing this building that the plaster should be dried by artificial heat such as was furnished by means of these radiators." McClean's charge for doing the work was $74.78.

Other facts contained in the report are stated in the opinion, where also are stated the various exceptions to the report.

The case came on for hearing on the exceptions to the master's report and on a motion for a final decree before *Dana, J.*, who reserved and reported the case for determination by this court.

*L. M. Friedman*, receiver, *pro se.*

*W. R. Heady*, for the Chapin National Bank.

*C. H. Beckwith*, for the Hampden Lumber Company.

*W. H. McClintock*, for the William N. Flynt Granite Company.

*J. F. Malley, W. G. McKechnie, J. D. Clarke, D. E. Leary & E. W. Beattie, Jr., J. L. Doherty & W. G. Brownson*, for various claimants, submitted a brief.

*P. A. Atherton & F. W. Moore*, for other claimants, also submitted a brief.

HAMMOND, J. There were two contracts between the Fosburgh Company and the county of Hampden.* The work called for by each has been completed, and the object of these

---

* The contracts were dated respectively November 9, 1905, and June 7, 1906.

proceedings is to ascertain among whom and in what manner shall be distributed the balances due from the county. The Chapin National Bank, hereinafter called the bank, asserts, by virtue of an assignment from the Fosburgh Company, an interest in the balance due upon the first contract. The other claimants furnished labor and materials and assert that by virtue of St. 1904, c. 349, they have liens upon these balances for the sums respectively due to them.

It will be convenient to consider first whether and to what extent these claims for liens are valid. The statute above named upon which the lienors rely is entitled "An Act to provide for the protection of persons furnishing materials and labor for public works," and reads as follows: "Officers or agents who contract in behalf of any county, city or town for the construction or repair of public buildings or other public works shall obtain sufficient security, by bond or otherwise, for payment by the contractor and subcontractors for labor performed or furnished and for materials used in such construction or repair; but in order to obtain the benefit of such security the claimant shall file with such officers or agents a sworn statement of his claim within sixty days after the completion of the work."

It is not denied by any of the parties that each of the two contracts between the Fosburgh Company and the county called for the construction of a public work within the meaning of that term as used in the statute, nor, so far as we understand, that the various claimants of liens filed their respective notices as required by the statute.

1. One of the contentions of the bank is that no part of the money now in the hands of the county commissioners is security for third parties within the meaning of the statute. It appears by the master's report that each of the two contracts was an "ordinary building contract of a standard form," and that in each one are the following clauses, "said clauses being in different parts of the contract":

"If at any time there shall be evidence of any lien or claim for which, if established, the owner or said premises might become liable, and which is chargeable to the contractor, the owner shall have the right to retain out of any payment then due, or thereafter to become due, an amount sufficient to completely in-

demnify it against such lien or claim. Should there prove to be any such claim after all payments are made, the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any lien on said premises made obligatory in consequence of the contractor's default."

" The party of the first part hereby agrees, in consideration of the full and faithful performance of the said several covenants and agreements of the party of the second part, to make payments on or before the tenth day of every month to the party of the second part, not exceeding in the aggregate the sum of eighty-five per cent of the cost of the work and materials during the preceding month, in lawful money of the United States of America; but no such payment shall be made except on the production and delivery to the party of the first part of a certificate in writing signed by the said architects, that this contract has been well and faithfully performed up to the date of such certificates, and that the value of the work, labor and materials theretofore rendered and employed in and upon the said building is at least fifteen per cent in excess of the payments called for by the party of the second part, to the extent and amount above described. But, on the full and final completion of the said building, the party of the first part is to pay, upon the certificate of the said architects that the same is due, the balance then unpaid of the full cost price of the said completed building, reckoning the cost of the said building at One Hundred and Eighteen Thousand, one hundred and eighty Dollars.

" The contract is applicable to and binding upon the executors, administrators, and assigns and successors, respectively of the parties hereto; but it is not assignable by the party of the second part, except with the written consent of the party of the first part."

In *Burr* v. *Massachusetts School for the Feeble-Minded*, 197 Mass. 357, it was adjudged that a clause identical with the first clause above named was to be regarded as the security required by the statute. In the course of the opinion delivered by Knowlton, C. J., it was said that under the statute it was the duty of the Commonwealth "in making the contract, to obtain security for the payment of these claimants. . . . The parties must be presumed to have known of this statute when they

made the contract before us." It is suggested by the bank that there is a material difference between that case and this. It is urged that the presumption upon which rested the decision in that case is one of fact only and so may be rebutted by evidence. And following out that idea, the bank at the hearing before the master offered to show that the county commissioners in office in 1905 did not know of the existence of this statute until some time in the year 1907. The rejection of this evidence by the master forms the basis of one of the bank's exceptions to his report.

We are of opinion that the legal meaning of the contract, so far at least as respects the rights of third parties, is to be determined by its phraseology read in the light of the then existing statutes. If in a matter as to which third parties have the right to be secured, the contracting parties, upon each of whom rests a duty, the one to furnish security and the other to see that it is furnished, use language the only sensible interpretation of which, when read in the light of the then existing law, is that it is a provision for such security, they must be bound by that interpretation. The presumption as to the meaning of the language is one not of fact but of law, so far as respects the rights of third parties. Any other rule of interpretation would make two contracts precisely alike in phraseology mean, the one that security is provided and the other that it is not provided. And this difference of meaning would be based upon a state of things not only not known but which could not be known with certainty by any third party interested in the security. It follows that the exception to the rejection by the master of the evidence offered should be overruled; and also that the motion that the report be recommitted for the purpose of taking evidence of a like ignorance of the statute on the part of the Fosburgh Company, and that the matter of security in any form to workmen or material men was not mentioned between the two contracting parties, nor was intended, was rightly overruled.

2. It is next urged by the bank that even if any sum is held under the statute as security for laborers and material men, the lienors in this case are subcontractors, and that parties bearing that relation to the work are not within the protection of the statute. A subcontractor may be briefly described as " one who

has entered into a contract, express or implied, for the performance of an act with a person who has already contracted for its performance." Phillips on Mechanics' Liens, (3d. ed.) § 44. In this general sense it is manifest that often, especially in building contracts, there may be a great difference in the remoteness of the subcontracts in their relation to what may be called the original or parent contract. For instance A., having entered into a contract with the owner of land to erect a house thereon, makes a contract with B. by which the latter agrees to do the excavation and mason work, B. sublets to C. the mason work, and C. in like manner lets out to D. that part of the mason work which relates to bricks and to E. that part which relates to stone, each contractor agreeing to furnish the labor and materials necessary for the performance of his contract. In the case supposed A. is the original contractor who alone is responsible to the owner for the due performance of the original contract, and to whom alone the owner is personally responsible for the payment of the original contract price. He is not a subcontractor. B. is a subcontractor and is alone responsible to A. for the performance of his contract with him. But B. also sustains another relation to the work. As between himself and C. he is an original contractor and C. is personally responsible to him alone for the performance of his (C.'s) contract. And as it is with B., so *mutatis mutandis* it is with C., D. and E. Each is a subcontractor, but there are differences of degree with respect to their remoteness from the parent contract. According to some of the authorities B. would be called a subcontractor of the first degree, C. of the second degree, and D. and E. of the third degree. See *McGugin* v. *Ohio River Railway*, 33 W. Va. 63, and *Kirby* v. *McGarry*, 16 Wis. 68.

In the present case it appears that all of the lienors with the exception of McClean are of the first degree so called; that the contract of each is with the Fosburgh Company, the original contractor with the county, the owner of the land. And it still further appears that in each of these contracts except some minor contracts for extra work with the lienors, there is a direct reference to the plans and specifications of the parent contract as a part of the subcontract. In other words, the thing contracted for is not definitely shown except by reference to the plans and

specifications of the parent contract.  This is not a case there-
fore where the subcontractor agrees to do certain things without
a knowledge of or a reference to the original contract, but is one
where he contracts with special reference to its requirements.
In some jurisdictions this is regarded as a vital distinction under
the statutes there existing; and it has been held in Michigan
under a statute substantially like St. 1904, c. 349, that such a
subcontractor differs from a mere laborer or material man and
is not within the protection of the statute.  *Avery* v. *Board of
Supervisors,* 71 Mich. 538.   *Staffon* v. *Lyon,* 104 Mich. 249.
*Hirth* v. *Powers,* 108 Mich. 339.    *Winkle Terra Cotta Co.* v.
*Cotteral,* 119 Mich. 27.

Among the considerations urged by the bank in support of the
contention that subcontractors, especially those of the first degree,
are not protected by the statute are the following: That the
primary purpose of the statute is to protect laborers and material
men " pure and simple " as distinguished from subcontractors;
that these latter are in a position to dictate payment to them-
selves according to their respective contracts as a condition to
further performance thereof; that their contracts involve the
element of profit over and above the value of the labor and
materials furnished, that in these and other respects there is a
great difference between the relation of the subcontractor to the
parent contract and that sustained by the laborer or material
man ; and that upon this difference the Legislature might well
base a distinction as to the right to a lien.  And it is further
urged that by necessary implication as well as by the plain read-
ing of the statute, this distinction has been made so that the
position of the subcontractor with reference to a right to a lien
is precisely the same as that of the original contractor who is not
protected by the statute.  It is further urged that any other
construction of the statute is inconsistent with the conservatism
characteristic of this kind of legislation, and that in practice it
would lead to inextricable difficulties and to injustice to the
owner.

Since the right to a lien upon real estate for labor and mate-
rials is a creature of statute, it is well to look into the general
history of the legislation leading up to St. 1904, c. 349, under
which the lienors claim.  St. 1819, c. 156, (substantially re-

enacted in Rev. Sts. c. 117,) the first upon the subject, gave a lien only to one who had contracted in writing with the owner. The right to a lien was extended by St. 1851, c. 343, to a laborer for labor actually performed under a contract either written or oral; and by St. 1852, c. 307, it was still further extended to any person to whom " any money was due for labor or for labor and materials furnished," and it was no longer necessary that the contract should be in writing. St. 1855, c. 431, still further defined the conditions upon which a lien attached. Finally by Gen. Sts. c. 150, the lien law was put into the shape, in which, with some minor modifications not here material, it has stood ever since. Pub. Sts. c. 191, R. L. c. 197. It gives a lien " for labor performed or furnished, or for materials furnished and actually used, in the erection, alteration, or repair, of any building or structure upon real estate." The lien is given irrespective of the question whether the lienor is the general contractor, or a subcontractor, or simply a laborer or material man, or whether the owner is personally liable to the lienor; *Williams* v. *Weinbaum*, 178 Mass. 238; *Beatty* v. *Parker*, 141 Mass. 523 ; *Wilson* v. *Sleeper*, 131 Mass. 177 ; *Kelley* v. *Border City Mills*, 126 Mass. 148; *Hilton* v. *Merrill*, 106 Mass. 528; *Mulrey* v. *Barrow*, 11 Allen, 152 ; and the fact that the original contractor with the owner has agreed that he will himself pay off all claims so that there shall be no liens is not fatal to the maintenance of a lien by a subcontractor, or laborer or material man. *Mulrey* v. *Barrow, ubi supra.* Nor is the fact that a subcontractor has been fully paid, or that for any other reason he could not himself maintain a lien for labor furnished, necessarily fatal to the lien of a laborer working under a contract with him. *Daley* v. *Legate*, 169 Mass. 257. *Bowen* v. *Phinney*, 162 Mass. 593, and cases cited. In the last case it was adjudged that a painter could maintain a lien for labor performed, although by reason of the poor stock furnished by the contractor for whom he worked the painting was of no benefit to the owner.

It is unnecessary to set forth further in detail our general lien law. Suffice it to say that a lien is given whether the lienor be the original contractor, a subcontractor of any degree, or simply a laborer or material man. And it is given, not as in some States

upon the funds in the hands of the owner as a part of the contract price named in the original contract, but upon the real estate itself and entirely irrespective of the question whether the owner is personally liable to the lienor, and of the question (so far as respects every one except the general contractor) whether there is in the hands of the owner any balance of the contract price. It is necessary only that the work be within the scope of the work called for by the parent contract. The owner must take care of himself. But for obvious reasons our general lien law did not apply to buildings or structures erected for public uses. *Lessard* v. *Revere*, 171 Mass. 294, and cases cited. *Young* v. *Falmouth*, 183 Mass. 80.

In this state of the law St. 1878, c. 209, was enacted. It is entitled "An Act to insure payment of wages earned and for materials used in constructing public buildings and public works," and is as follows: "When public buildings or other public works are about to be built or repaired for this Commonwealth by contract, upon which liens might attach for labor or materials if they belonged to private persons, it shall be the duty of the officers or agents contracting in behalf of the Commonwealth to provide sufficient security, by bond or otherwise, for payment by the contractor and all subcontractors for all labor performed or furnished, and all materials used in the construction or repair thereof." The debt to be secured by this statute is the same in nature as that for which in the case of a private building or structure a lien is provided under the general lien law. *Kennedy* v. *Commonwealth*, 182 Mass. 480. The security is for the payment of such debts due from the "contractor and all subcontractors." Of course this does not mean that the debt to be secured shall be due from the contractor and subcontractors jointly. The words are used distributively and require only that the debt shall be due from either the contractor or some one of the subcontractors. It is enough if it be due from any one of them. The primary purpose of the use of the phrase "contractor and all subcontractors" is not to exclude them from the right to a lien, but to describe the individual debtors whose creditors on account of labor and materials are to be secured. And the reason the original contractor has no security under the statute is not

because he is named as a debtor, but because he never can be a creditor within the terms of the statute. He never can be his own creditor, nor can he in his capacity of the original contractor ever become a creditor of any subcontractor or laborer or material man. If however he should in his individual capacity furnish labor or materials to a subcontractor, he would seem to be as such individual a creditor of such subcontractor within the meaning of the statute, and would be entitled to its protection so far as he was such a creditor. There would seem to be a substantial reason for excluding the general contractor as such from the benefit of the statute. In one important respect he stands alone and apart from all others engaged on the work. He holds the Commonwealth which may well be regarded as ample security.

Not so with the subcontractor, whatever may be his degree. He is not only named as a possible debtor, but it is certain that he may be a possible creditor of the original contractor, or of some subcontractor of a higher degree than himself. He of course needs no security as a debtor, but there is no apparent reason why as a creditor either of the original contractor or of some superior subcontractor, he should not have security. As a creditor of either of these he surely comes within the express terms of the statute. He does not hold the Commonwealth as does the original contractor. Moreover there is an obvious reason why in describing the debtors whose creditors should be secured the subcontractors should be included. Many if not most of the laborers and material men would be likely to have no direct contractual relation as creditors with any one except a subcontractor, and it was well to be sure and include such creditors by specifically including subcontractors among the persons whose creditors might be entitled to the benefit of the statute. It is to be borne in mind, also, that, whatever may be the distinction in the lien laws of other States between subcontractors on the one hand and laborers and mere material men on the other, in our general lien law, as is above stated, there are no such distinctions, much less are there any between subcontractors of different degrees.

Interpreted in the light of our general lien law it is manifest that the purpose of this statute was in the case of a State build-

ing to secure, by bond or otherwise, the payment of the kind of debts for which in the case of a private building there was security by lien. There is only one exception, and that is the debt due to the general contractor; and for that he holds the Commonwealth and is presumed to need no further security. In a word, whoever is a creditor of either the original contractor or of a subcontractor of any degree, for labor performed or furnished, or for materials furnished and actually used in the public work is within the protection of the statute; and he is none the less a creditor from the fact that he is also a subcontractor and as such a debtor to some other person also entitled to the security required by the statute.

There is nothing inconsistent with this view in St. 1873, c. 353, re-enacted with some modifications in Pub. Sts. c. 112, §§ 143–147 (now R. L. c. 111, §§ 164–168), which statute gives to certain laborers and material men a right of action against a railroad. In that statute certain contractors and subcontractors are excluded from its benefits. The fair inference is that but for this specific exclusion they would have been included in the general description of the class named in the first section as the persons to whom the right to sue is given. And the same may be said of St. 1904, c. 373, extending a similar remedy in the case of construction of street railways. Nor is there anything favorable to the contention of the bank to be found in St. 1892, c. 270 (now R. L. c. 25, § 57), which gives in certain cases to laborers an action against a city or town.

St. 1904, c. 349, is similar to St. 1878, c. 209 (now R. L. c. 6, § 77), and must receive a similar interpretation. It simply extends to persons engaged in building public works of a county, city or town the same right of security as had been given by the previous statute to persons engaged on public works of the State.

If upon a similar statute of any other State decisions have been there rendered which are seemingly in conflict with the conclusion to which we have come as to our statute, it may be that the reason for the difference is to be found in some variation in the language of the statutes, or in the nature of their respective general lien laws; but whether that be the case or not, in so far as any such decision is in actual conflict in principle with our

interpretation of our own statute we cannot follow it.   Upon the facts found by the master it therefore must be held that the sums remaining in the hands of the county commissioners are held as security for lienors, including subcontractors.

3. It is settled, however, as above stated, that the statute provides security only for such a debt as could form a basis for a lien if the building or structure belonged to a private person; and it is urged by the bank that the first contract of the William N. Flynt Granite Company,* hereinafter called the granite company, was an entire contract for an entire price, that some of the work· called for by the contract and actually done could not have formed a basis for a lien had the building been owned by a private person, and that therefore, under the well established doctrine of this Commonwealth (see *Gogin* v. *Walsh,* 124 Mass. 516, and cases cited), there could be no lien for anything under the contract; and hence the granite company is not protected by the statute as to any part of the sum due to it under the contract.   Similar objections to the

---

* The granite company contracted to "Do all excavation, grading, back filling of every kind, build all foundations, drains, make connections with the sewers, and pay all expenses for so doing, dry well, furnish and lay Akron pipe, damp proofing, concrete and granolithic work, sidewalks, trenches, furnish and lay blue stone for covering trenches and wherever called for, furnish and put in place all wire cloth anchors, furnish and lay all brick required for trenches, piers, interior walls, backing up of granite, etc., furnish Monson Granite for exterior walls, cut and set same, do all carving and modelling, said models to be furnished and said carving to be done by John Evans & Company of Boston, Mass., furnish and provide all forms, scaffolding, staging, centers, etc., required for the work, put in place all iron anchors to be furnished by iron contractor, and do any and all work in connection with the foundations and masonry work throughout, and complete the building ready for the roof, excepting the finish grading which will be done by another contractor, and all good loam soil found on the premises in the excavation is to be left on the premises for this purpose instead of being carted away while excavation is being done. . . .

"It is hereby further agreed that the contractor is to provide all necessary fences, sidewalks, guards, lights, etc., for the protection of the public, watchman, and comply with all the city ordinances regarding permits, etc., and when the above described work is completed to remove from the premises all unused materials, rubbish, etc., and leave the lot around the building clean and properly graded for relaying the finish soil upon the same, and make good any necessary repairs to the old sidewalk so as to leave the same in as good condition as before starting the work. . . ."

allowance of the granite company's claim are made by the Hampden Lumber Company.

The only clauses of the contract upon which these objections are based are those providing for the erection of a temporary fence, for the removal and handling of loam, for grading and for a watchman. The exception of the Hampden Lumber Company founded upon the provisions of the contract respecting scaffolding and staging has been waived. There can be no doubt that the contract was entire for an entire price; and that it specially provided for the things upon which those exceptions are based. In accordance with these provisions the granite company erected upon the State Street side of the lot "a very light board temporary cheap fence," and while engaged upon the buildings employed a night watchman, and excavated and removed the earth and did the grading as fully set forth in the master's report. The master found specially that it was necessary to have fences in order to keep people out, and a watchman "to protect the property and materials while the building was being built"; and he further found generally that the "labor performed and furnished and the materials used by" the granite company "were respectively performed, furnished and used in the construction of said buildings"; and it appears from the report of the justice upon which the case is before us that all parties have agreed that "the findings of the master as stated in his report are that each and all of said items were used in the construction of the said Hall of Records building as erected and were reasonably necessary to its proper construction, and not merely that said items were necessary to the completion" of the contract under which they were furnished.

Since the lumber used in the construction of the fence is not shown to have gone into the permanent construction of the building it may be that the material man who sold the lumber to the granite company could have no lien; *Kennedy* v. *Commonwealth, ubi supra,* and cases cited, but even if that be so it by no means necessarily follows that the provision in the contract for the building of the fence is fatal to the granite company's claim of a lien. The granite company agreed to erect a permanent structure. Brick and stone were to be laid. Such work requires the application of contrivances. There must be staging

and scaffolding.  Frequently in the erection of large buildings derricks and other appliances are used to raise the material to its proper place ; rough temporary elevators are built, for use in construction only, and are torn down before the full completion of the building; temporary fences are constructed, and temporary doors and windows are inserted to protect the property from personal intrusion or from the weather, so that the work may go on.  All these things are in general use and their use is fairly contemplated by the contract.  The materials of which these temporary structures are composed form no part of the permanent structure and are not intended to.  But the expenses incurred by the contractor in erecting and using them constitute one of the items of the cost of the material and labor which finally do go into the building.  While the man whose only relation to the sand used in making the mortar for plastering a building is that he carts it from the earth bank to the building, may have no lien for the expense of carting, (*Webster* v. *Real Estate Improvement Co.* 140 Mass. 526,) still the contractor who puts the material into the building may have a lien for its value when finally put into the building although in this value is included the cost of carting.  And while the material man whose only right to a lien is based upon the fact that the material furnished by him finally forms a part of the permanent structure, and whose only relation to the building is that he furnished lumber used solely in constructing forms to hold concrete in place while it was hardening, and " centres " to hold up concrete arches, which centres were then taken down and used elsewhere and never formed a part of the completed structure, can have no lien for the lumber, (*Kennedy* v. *Commonwealth, ubi supra,*) yet there would be no doubt that the general contractor could have a lien for the cost of the concrete work as finally established in the building although, in the estimate of its cost, the cost of the use of these temporary forms is included.  In a word, while these temporary appliances may not, and when considered by themselves alone generally do not, form the basis for a lien, still their cost or the value of their use is properly an element in the estimate of the cost of the work and materials finally crystallized into the permanent structure called for by the contract.  Every contract for the construction of a large building necessarily im-

plies the use of temporary appliances; and where the contract is for an entire price, the cost of them or of their use is necessarily included in the estimated cost of the structure to be built.  As above stated the master has found that all the labor performed and furnished, and all the materials furnished by the granite company were reasonably necessary for its proper construction. We do not understand this finding to mean that the lumber used to construct the fence became a part of the permanent building, but simply that the fence was reasonably necessary for the protection of the building from intrusion, accidental or intentional, while in process of construction.  And so of the watchman. His presence was necessary to protect the property and materials. With the exception of the small office building which formed no part of the entire contract and which will be hereafter considered, we think that the evidence and facts stated by the master justify the findings.  The changing of the loam and the carting of it may be fairly regarded as merely incidental to the grading, and the whole matter of the grading is within the principle of *Reid* v. *Berry*, 178 Mass. 260.  If therefore no mention of these various items had been made in the contract of the granite company they might have been regarded as reasonably necessary in carrying out the contract for the construction and for the grading.  It can make no difference that the contract expressly provides for them.  The express mention of what would be otherwise fairly implied cannot change the nature of the contract or the rights of the parties.  The existence of these provisions in the contract, therefore, and the acts of the granite company thereunder, are not fatal to the maintenance of the company's lien.  The small office building above mentioned, which was not provided for in the contract, was built as an " extra," under an oral agreement with the county.  It therefore can have no bearing as to the maintenance of the lien.  Moreover the granite company waives any right for a lien as to its cost.  The $39.16 included in the granite company's claim as its share of the cost of the building therefore will be disallowed.

It follows that the second exception of the bank, (except the part relating to the small office building, which is sustained,) and the exceptions of the Hampden Lumber Company, so far as founded upon its first and third objection, (except that

part relating to scaffolding and staging, which is waived,) are overruled.

The lien of the granite company, therefore, must be established to the amount found due by the master less the $39.16 above mentioned.

4. Some objection has been urged against the establishment of the lien of Henry J. Pratt and Company, but we think that the parties to the two contracts regarded them as closely connected with each, and there is nothing in the master's report inconsistent with the establishment of their lien for the amounts due to them for work both upon the Hall of Records and the boiler house, including the $2.90 named by the master. Upon the facts found by the master the claims of all the other lienors also, with the exception of McClean, are established to the amounts respectively found due. The lien claimed by McClean is not established. So far as respected his contract with the Fosburgh Company he furnished an article which was not to enter into the permanent structure of the building, and his case stands with cases like *Kennedy* v. *Commonwealth*, 182 Mass. 480. While it is true that the article subsequently became a part of the permanent structure, yet it appears that this was done by virtue not of any contract with the Fosburgh Company but of a separate contract between McClean and the county commissioners. It is obvious, therefore, that he cannot look to any security provided for lienors in either of the contracts between the Fosburgh Company and the county commissioners.

Under the statute and the provisions for security these claims thus established must in the case of each contract have priority over any assignment by the Fosburgh Company. The county commissioners, in voting to use and appropriate the balances in their hands to the payment of these claims due respectively upon the contracts, simply voiced the mandate of the law. They only performed a duty incumbent upon them under the statute. The assignment to the bank related simply to the first contract. As it appears that the balance in the hands of the county commissioners is not sufficient to pay the lienors under that contract there can be nothing for the bank; and hence it becomes unnecessary to consider the other grounds relied upon to defeat the assignment.

5. It appears that in the case of each contract the balance in the hands of the county commissioners is insufficient to pay the lienors in full, and therefore there would be no need to consider the question of interest if the claims became due all at the same time. But as this does not seem to be the case it is proper to consider the question. Strictly speaking, interest should be reckoned on each claim as established up to January 25, 1908, the time when the bill was filed. Inasmuch, however, as the master has computed the interest up to January 12, 1909, and as it has been suggested that that course is satisfactory to the lienors, the interest may stand as computed by the master unless some lienor objects in writing within ten days from the filing of the rescript, in which case it will be computed on all claims to the time of the filing of the bill. In the case of each contract the balance in the hands of the county commissioners, with its accretion, shall be divided *pro rata* among the lienors.

The conclusion to which we have come renders it unnecessary to notice more specifically in the opinion the exceptions to the master's report. They all have been considered. Some of them become immaterial. All material exceptions inconsistent with the conclusion reached are to be overruled, and the distribution of the two balances now in the hands of the county commissioners is to be made upon the principles above set forth; the form and details to be settled by a judge of the trial court. No costs are to be allowed in favor of or against any party.

*So ordered.*