### INTERSTATE ELECTRICAL SERVICES CORPORATION *VS.* CUMMINGS PROPERTIES, LLC, & another.[1]

No. 02-P-1169.

Middlesex. December 11, 2003. - April 20, 2005.

Present: LAURENCE, COWIN, & McHUGH, JJ.

*Mechanic's Lien.*

In an action to enforce a mechanic's lien, the judge properly granted judgment in favor of the plaintiff, where the plaintiff demonstrated that it had filed the required notices of the underlying contracts in a timely manner (i.e., within ninety days after the plaintiff had performed additional work that was required for the proper performance of the contracts), and where, under the circumstances of the case, the two contracts at issue were in fact constituent parts of a single agreement. [298-302]

CIVIL ACTION commenced in the Superior Court Department on May 30, 2000.

The case was heard by *Peter M. Lauriat,* J., and a motion to alter or amend the judgment was also heard by him.

*David R. Suny* for the defendants.

*John J. McNamara* for the plaintiff.

McHUGH, J. Anderson Estates, Inc. (Anderson), and Cummings Properties, LLC (Cummings), appeal from a judgment entered in the Superior Court enforcing a mechanic's lien, see G. L. c. 254, §§ 1 et seq., in favor of the plaintiff, Interstate Electrical Services Corporation (Interstate), and from a judge's order denying the defendants' motion to alter or amend that judgment or to make additional findings. We affirm.[2]

---

[1]Anderson Estates, Inc.

[2]In light of our conclusion, the defendants' argument that the judge's denial of their motion to alter or amend the judgment or make additional findings, on the ground that Interstate did not meet its burden of proof on its October 27, 1999, contract claim, must fail. The judge's findings of fact will not be set

The controversy arises out of electrical work Interstate performed in late 1999 and early 2000. In late summer of 1999, Aurora Graphics, Inc. (Aurora), entered into a lease of a building owned by Anderson and managed by Cummings. Shortly after beginning its tenancy, Aurora sought to increase the building's electrical capacity. To that end, Aurora entered into two written contracts with Interstate and informed Cummings that Interstate was going to provide electrical work "in accordance with their contracts."

The first of the two contracts, dated October 20, 1999, required Interstate to supply and install a "GE 1200 amp circuit breaker combination cabinet" and to install conduits, ground rods, and copper wire at a cost of $24,542.72. The cabinet was essentially a metal box used to enclose the circuit breaker. Both Federal and State electrical codes required a label on the outside of the cabinet and on the circuit breaker, identifying the breaker's 1,200-ampere (amp) capacity. The contract included a note reading, "Excavation price to follow." On November 17, 1999, Interstate applied for, and was granted, the necessary permits to perform the work the first contract required.

The second contract, dated October 27, 1999, required Interstate to (1) subcontract with an excavator to dig a trench that was necessary for the underground connection between a Boston Edison transformer and the 1,200-amp circuit breaker combination cabinet that was the subject of the October 20 contract, and (2) supply Aurora with additional electrical equipment for Aurora's in-house electrician to install. The contract price was $19,172.70. Interstate supplied the equipment and subcontracted with the excavator at some point before December 31, 1999.[3]

By December 29, 1999, Interstate had completed most of the work required under both contracts. However, the label on the circuit breaker cabinet incorrectly read "800 AMP" rather than

aside unless clearly erroneous, and here there was ample evidence to support the judge's ruling. See *Desrosiers* v. *Germain*, 12 Mass. App. Ct. 852, 856 (1981), citing Mass.R.Civ.P. 52(a), 365 Mass. 730, 816 (1974).

[3]The judge made no actual finding on when Interstate supplied Aurora with the materials required under the October 27 contract or when Interstate subcontracted for the excavation work. However, there is no dispute that Interstate did so prior to December 31, 1999.

the required 1,200 amps.[4] An inspector for the city of Woburn noted the 800-amp label in the report of his final inspection of the installed system. Because of that label, he approved the electrical system to operate at only 800 amps, although the permit had been for 1,200-amp service.

Over the next four months, Interstate negotiated with General Electric and Underwriters Laboratories (UL), the cabinet maker and label supplier, respectively, regarding the required label change. Ultimately, on April 17, 2000, an Interstate employee and a UL representative went to the building to perform certain tests and switch the labels. Although the tests were performed, faulty paperwork prevented the replacement of the label at that time.

On April 18, 2000, the day after the tests, Aurora filed for bankruptcy. The label, therefore, was never corrected. On May 30, 2000, Interstate recorded two notices of contract and two statements of account in the Middlesex County registry of deeds. See G. L. c. 254, §§ 2, 8. The recordings referred to the October 20 contract and the October 27 contract. The same day, Interstate filed a verified complaint seeking enforcement of the lien pursuant to G. L. c. 254, § 5. The defendants opposed the enforcement effort on the grounds that Interstate had not filed the notices of contract and statements of account within the time the statute required; that the defendants had not consented to the work; and that Interstate's work did not constitute an improvement to the property.[5] G. L. c. 254, § 2.

Following a bench trial, a Superior Court judge concluded that the work Interstate performed in April was required under "the contract" but did not specify which contract. The judge awarded Interstate $43,715.42, the total due under both contracts, plus costs and $9,342.01 in interest.

On appeal, all parties agree that the judge implicitly found that the April work was performed under both contracts. They

___

[4]The label had been supplied to General Electric, the cabinet maker, by Underwriters Laboratories.

[5]The defendants do not press the latter two arguments on appeal. It is worth noting, however, that the trial judge found that "Interstate made arrangements for the work to be performed in late December 1999, with the consent of Cummings as managing agent of Anderson."

disagree somewhat on the underpinnings for that finding. The defendants contend that the trial judge implicitly concluded either that Interstate's April work was required by both contracts or that the contracts, though written separately, were constituent parts of a single project and, thus, should be treated as one. Interstate urges simply that the judge implicitly found that the April work was necessary to complete both contracts.

Against that backdrop, the defendants make three arguments. First, they claim that any implicit finding of fact that Interstate's April work was required by the October 27 contract was clearly erroneous. Second, they assert that, to the extent that the April work was required by the October 20 contract, performance of that work could not have extended the filing deadline for the October 27 contract as a matter of law. Finally, the defendants argue that the work required by the October 20 contract was substantially complete in December of 1999 and the work performed in April was repair or warranty work that did not extend the filing deadline for that contract.

Interstate, of course, disagrees. It begins with the judge's finding that the contract required Interstate to provide the correct label for the electrical equipment it installed. According to Interstate, the judge's decision reflects an implicit determination that *both* contracts required a proper label because he explicitly found that the contracts had a single purpose, i.e., the provision of labor and materials for electrical improvements to Aurora's leased premises. Finally, Interstate contends that the judge was correct in finding that the April work was necessary to complete the contract work, and was not simply repair or warranty work, because installation of an accurate label was required under State law before the system could operate at the contractually required amperage level.

In resolving those competing claims, we must "not reverse [the judgment below] 'unless the facts on which the conclusion was based are clearly erroneous' or unless 'the findings or conclusions are tainted by an error of law.' " *Davidson Pipe Supply Co.* v. *Johnson*, 14 Mass. App. Ct. 518, 525 (1982), quoting from *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 674 (1977).

Under the Massachusetts mechanic's lien statute, a person

who has entered into a written contract with the "owner of any interest in real property, or . . . with the consent of such owner," G. L. c. 254, § 2, inserted by St. 1996, c. 364, § 2, "for improvements to that property, or for the furnishing of equipment, appliances, or tools for such improvements, 'shall have a lien upon such real property . . . to secure the payment of all labor, . . . services, and material . . . which shall be furnished by virtue of said contract.' " *Tremont Tower Condominium, LLC* v. *George B.H. Macomber Co.*, 436 Mass. 677, 679-680 (2002), quoting from G. L. c. 254, § 2. To obtain the lien, a contractor must show (1) it recorded a "notice of contract" in the proper registry of deeds; (2) that it did so ninety days after it "last performed or furnished labor or materials or both labor and materials," G. L. c. 254, § 2[6]; and (3) that it filed a statement of account detailing the amount due within "120 days after [it] last performed or furnished labor [or] materials . . . for the project." *Tremont Tower Condominium, LLC* v. *George B.H. Macomber Co.*, 436 Mass. at 680-681, citing G. L. c. 254, § 8.

No one contends that Interstate failed to file notices of contract in proper form in the proper registry of deeds. Insofar as the October 20 contract is concerned, there is no dispute that, as of December 31, 1999, Interstate had installed the contractually required 1,200-amp circuit breaker, the combination cabinet, the conduit, the ground rods, and the copper wire necessary to supply power to the breaker. The inspector's December inspection report, however, noted that the system could operate at only 800 amps, not at the 1,200-amp power level of the system Interstate had agreed to supply. Therefore, although a substantial portion of the physical work required by the October 20 contract was complete by December 31, 1999, State law required additional work to be done before Aurora was able to utilize the 1,200-amp electrical service for which it had contracted.

Under these circumstances, we think that the time for filing

_____

[6]The statute's two other deadlines for the recording of a notice of contract are not at issue in this case. See G. L. c. 254, § 2 (where parties to contract filed notice of substantial completion, notice of contract must be filed no later than sixty days from such filing; where contract has terminated and owner has filed notice of termination, notice of contract must be filed no later than ninety days after such filing).

the notice of contract began to run after Interstate performed its April work. The general rule is that if additional work is required for the proper performance of a contract even after contractual work is substantially completed, the "period for filing the lien will run from the doing of such work . . . regardless of the value [thereof] if not so trivial or inconsequential that failure to do it would still leave the contract substantially performed." 56 C.J.S. Mechanics' Liens § 157 (1992). See *Thurston* v. *Blunt,* 216 Mass. 264, 267-268 (1913) (time extended where terms of contract required leaving "everything in a first class condition"). And "mere delay in completing the contract and performance of trifling items of work have never been held under our statute fatal to a maintenance of a lien, if the work was done in good faith, and was necessary to a complete performance of the contract." *See* v. *Kolodny,* 227 Mass. 446, 450 (1917) (holding that additional work done to elevator, although small in comparison to installation job, extended time for perfecting lien). See *Winer* v. *Rosen,* 231 Mass. 418, 421-422 (1918) (removing and replacing safety valve and steam gauge following notification by State boiler inspector that changes were necessary for boiler's lawful operation extended time for filing lien under contract for installation of boiler). Cf. *Carter* v. *Commonwealth,* 290 Mass. 97, 102-104 (1935) (although uncertainty existed regarding which party was responsible for defect in subcontractor's work, date on which subcontractor remedied defect, "so that there could be no doubt that he had fulfilled his contract," extended time for perfecting lien).

The April work Interstate performed was not, as the defendants would have it, a gratuitous act designed to replace or remedy a defect in the original work. Contrast *Mario Pandolf Co.* v. *Commonwealth,* 303 Mass. 251, 257 (1939), quoting from *Peerless Unit Ventilation Co.* v. *D'Amore Constr. Co.,* 283 Mass. 121, 125 (1933) ("[W]ork done under a new and independent arrangement, made after the original contract or continuing employment has ended, or a gratuitous performance of work not contracted for, does not set the time running so as to preserve a lien for the earlier work"). See 53 Am. Jur. 2d

Mechanics' Lien § 212 (1996).[7] Instead, that work was an essential component of Interstate's ability to deliver the 1,200-amp electrical service it had contracted to deliver.[8]

Turning to the October 27 contract, we begin with *Massachusetts Gas & Elec. Light Supply Co.* v. *Rugo Constr. Co.*, 321 Mass. 20, 23 (1947), a case on which the defendants rely. There, the Supreme Judicial Court stated that a person supplying labor or materials "under separate and independent contracts . . . must file a sworn statement within a certain number of days after completion of his work . . . and he cannot establish a lien under the earlier contract unless the statement is filed within the prescribed period, even if it is filed seasonably with reference to the second contract."[9] *Ibid.* This holding is consistent with the general rule that where labor is furnished under "separate contracts, the contracts cannot be tacked together so as to enlarge the time for filing a lien for what was done [] under either." 56 C.J.S. Mechanics' Liens § 152. See *Peerless Unit Ventilation Co.* v. *D'Amore Constr. Co.*, 283 Mass. at 125; *Mario Pandolf Co.* v. *Commonwealth*, 303 Mass. at 255-257 (contract for bridge steel was separate from contract to supply paint, and therefore, notice filed in timely fashion with respect to latter contract did not establish lien for amounts due under former). See also 53 Am. Jur. 2d Mechanics' Liens § 208 ("[W]here the labor or materials are furnished under separate contracts a lien must be filed for work performed or labor furnished under each contract within the statutory period after its completion").

The cited cases, however, only apply to situations in which the work proceeded under truly separate contracts. Fairly read,

---

[7] The defendants' argument that the April work was done under warranty is unconvincing. Interstate's warranty was sent to customers after projects were complete. In this case, the warranty was never sent because Interstate "never finished the project."

[8] Interstate's vice-president testified that while the service Interstate installed may have been adequate to run Aurora's existing printing press, it was not "what we sold the customer."

[9] The court did specify an exception in cases where the contracts "constitute a continuous employment." *Massachusetts Gas & Elec. Light Supply Co.* v. *Rugo Constr. Co., supra.* However, Interstate does not contend, and the judge did not find, that the October 20 and October 27 contracts constituted continuous employment.

we think that the trial judge's opinion reflects a finding that, although written separately, the two contracts were in fact constituent parts of a single agreement. The record provides ample support for such a finding. Both contracts were entered into at approximately the same time, the earlier one made reference to the excavation work that was the subject of the later, completion of both was necessary before Aurora could enjoy the fruits of either, and the two could just as easily have been constituent parts of a single agreement. That the parties chose to write them on separate pieces of paper cannot obscure their unitary nature or, at the very least, prohibit the trial judge from finding that the two were in fact components of a unitary contract. See *Gilmore* v. *Century Bank & Trust Co.*, 20 Mass. App. Ct. 49, 56 (1985); *Chase Commercial Corp.* v. *Owen*, 32 Mass. App. Ct. 248, 250-251 (1992). Cf. *Friedman* v. *County of Hampden*, 204 Mass. 494, 512 (1910).

*Judgment affirmed.*

*Order denying motion to alter or amend judgment affirmed.*